# Exhibit  D

נספח י"ז

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NY

JODY KRISS and MICHAEL EJEKAM, directly and derivatively on behalf of
BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC; and
BAYROCK WHITESTONE LLC;

           Plaintiffs,

    v.

BAYROCK GROUP LLC; TEVFIK ARIF; JULIUS SCHWARZ;
FELIX SATTER; BRIAN HALBERG; SALVATORE LAURIA;
ALEX SALOMON; JERRY WEINRICH; SALOMON & COMPANY PC;
AKERMAN SENTERFITT LLP; MARTIN DOMB; CRAIG BROWN;
DUVAL & STACHENFELD LLP; BRUCE STACHENFELD;
DAVID GRANIN; NIXON PEABODY LLP; ADAM GILBERT;
ROBERTS & HOLLAND LLP; ELLIOT PISEM; MICHAEL SAMUEL;
MEL DOGAN; BAYROCK SPRING STREET LLC; JOHN DOES 1-100;
BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK LLC;
BAYROCK MERRIMAC LLC; BAYROCK GROUP INC.; and
NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.;

           Defendants
        and

BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC, and
BAYROCK WHITESTONE LLC

           Nominal Defendants (Derivative Plaintiffs)

**VERIFIED
COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs Jody Kriss ("Kriss") and Michael Ejekam ("Ejekam"), through their counsel, allege:

## INTRODUCTION

1.    Plaintiffs, members in and creditors of Bayrock limited liability companies, directly and

derivatively seek relief from Arif, Satter, Schwarz, for violations of substantive and conspiracy

provisions of the Racketeer Influenced and Corrupt Organizations Act; from Halberg, Salomon,

Weinrich, Salomon & Co., Roberts & Holland, Pisem, Duval & Stachenfeld, Stachenfeld, Granin,

Brown, and Dogan for violations of its conspiracy provision; and variously from all Defendants

for violations of substantive, aid and abettance, and conspiracy provisions of state law.

2.      The Bayrock Organization ("Bayrock") is a New York-based group of real estate businesses claiming to have developed, owned, or operated $5,000,000,000 of projects globally.

3.      Generally, Bayrock is a hierarchy of commonly controlled, but not wholly owned, limited liability companies. Bayrock Group LLC is the top of the hierarchy, control parent of the lower-tier companies. Since 2002, Arif and Satter, joined by Schwarz in 2005, have owned most of Bayrock, have controlled Bayrock Group LLC, and through control of Bayrock Group have controlled most of the entities in the hierarchy.

4.      Bayrock does conduct legitimate real estate business, but for most of its existence it was substantially and covertly mob-owned and operated. Arif, Satter, and Schwarz operated it for years through a pattern of continuous, related crimes, including mail, wire, and bank fraud; tax evasion; money laundering; conspiracy; bribery; extortion; and embezzlement.

5.      Almost everything they took from Bayrock, the $8,000,000 Satter took, the $4,000,000 Schwarz took, and the $15,000,000 Arif took, came from crime rather than legitimate profit.

6.      Thus, Arif, Satter, and Schwarz are not only organized businessmen, they are organized criminals, operating Bayrock through acts of racketeering as, or at least in, its normal course.

7.      Satter is an organized criminal and racketeer by career choice, with a history of felonies including convictions for violating federal racketeering law and for assault with a deadly weapon.

8.      Arif made Satter Bayrock's covert majority owner and co-control person even while Satter was awaiting sentencing on a prior federal racketeering conviction, then immediately began crimes with him, committing tax fraud and obstructing justice in that sentencing by hiding Satter's near $1,000,000 a year unreported and untaxed cash skim from, ██████████ Bayrock from his presentencing Probation Officer, letting Satter fake poverty to evade restitution.

9.      Arif and Schwarz are organized criminals and racketeers by definition, their participation in and facilitation of the predicate crimes making them the kind of defendants RICO was meant to capture, what the ABA RICO Task Force calls "persons who regularly commit such crimes."

2

10.     Regularly commit crime they did. They evaded up to $20,000,000 of their tax liabilities; conspired to evade $100,000,000 tax; and defrauded, embezzled, and extorted millions of dollars from Plaintiffs, repudiating their Bayrock membership interests, then worth over $30,000,000.

11.     Concrete example of their crime, Trump SoHo, stands 454 feet tall at Spring and Varick, where it also stands monument to spectacularly corrupt money-laundering and tax evasion:

12.     Using artifices to defraud architected by Roberts & Holland and Duval & Stachenfeld in conspiracy with them[1], Arif, Satter, Scwharz arranged for up to $250,000,000 of Bayrock's profit as the co-developer[2] of Trump SoHo to be laundered, untaxed, through a sham Delaware entity to Iceland (and reportedly then Russia), intending to evade up to $100,000,000 of U.S. taxation.

13.     Despite the promises of tax revenues Trump SoHo would bring the city, nearly half its profits were years ago fixed to evade taxes. Ten cents of every dollar of condominium sales was set to be siphoned, untaxed, out of the country through this Delaware tax laundromat, testament to corrupt professionals who put obeisance to a racketeering client before ethics, honor, and the law.

14.     Plaintiffs thus sue for conspiracy to violate RICO attorneys and accountants who agreed to knowingly facilitate the racketeering, in doing so committing crimes: Roberts & Holland (and attorney Pisem) and Duval & Stachenfeld (and attorneys Stachenfeld, Brown, and Granin), who conspired with them to commit money laundering to evade tax and conspired with them to and did commit mail and wire fraud and tax evasion; and Salomon (and accountants Salomon and Weinrich), who conspired with them to commit money laundering to evade tax and conspired with them to and did commit mail and wire fraud, tax evasion, tax perjury, and tax obstruction.

15.     Indeed, tax evasion and money-laundering are the core of Bayrock's business model:

---

[1] There is no evidence Trump took any part in, or knew of, their racketeering. Any contrary inference would be unjust.
[2] Arif, Satter, and Schwarz intentionally omitted any mention of Satter, his shared, substantial ownership in and control of Bayrock Group LLC, Exh. D, his majority ownership of the whole Bayrock Organization, Exh. D, and his conviction for racketeering predicated on securities fraud, Exh. A, from the offering documents, falsely stating Arif "owned" Bayrock Group LLC when he owned little more than half, and only about 18% of the entire Bayrock Organization.

3

TAX EVASION AND MONEY LAUNDERING

16.   Substantive Crimes. Arif, Satter, and Schwarz, variously, in operating Bayrock did:

    A.   Tax Evasion. Attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by Bayrock tax partners, creating a material tax deficiency of as much as, or more than, $20,000,000, in violation of 26 UC §7201.

    B.   Failure to Pay. Fail to collect and pay over tax, in violation of 26 USC §7202.

    C.   Failure to Make Returns. Fail to supply information and make returns, in violation of 26 USC §7203.

    D.   Failure to Make a Statement. Fail to make a statement (W-2) as required by law, in violation of 26 USC §7204.

    E.   Tax Perjury. Subscribe perjurious returns, and aid and assist with the preparation of documents known materially false, in violation of 26 USC §§7206(1) and 7206(2).

    F.   Tax Obstruction. Corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the IRS, in violation of 26 USC §7212(a).

    G.   Money Laundering. Knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from specified unlawful activity, in violation of 18 USC 1957.

    H.   Money Laundering. Conduct and attempt to conduct financial transactions involving proceeds of specified unlawful activity, said proceeds known to be from unlawful activity

        I.   with the intent to promote the carrying on of specified unlawful activity, including further acts of racketeering, in violation of 18 USC §1956(a)(1)(A)(i).

        II.   with the intent to evade taxation, in violation of 18 USC §1956(a)(1)(A)(ii).

        III.   knowing the transactions were designed to conceal or disguise the nature, source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 USC §1956(a)(1)(B)(i).

4

I. <u>Money Laundering</u>. Transport, transmit, and transfer funds from a place in the United States to a place outside the United States and to a place in the United States from a place outside the United States

    I.    with the intent to promote the carrying on of specified unlawful activity, including further acts of racketeering, in violation of 18 USC §1956(a)(2)(A).

    II.    knowing the transactions were designed to conceal or disguise the nature, source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 USC §1956(a)(2)(B)(i).

J. <u>Fraud and False Statements</u>. Make materially false statements and representations in matters within the jurisdiction of the executive branch, in violation of 18 USC §1001.

K. <u>Obstruction of Justice</u>. Corruptly endeavor to impede a U.S. court officer, making false statements and representations to a Probation Officer, in violation of 18 USC §1503.

17. <u>Conspiracy Crimes</u>. Arif, Satter, and Schwarz, together[3], with each other and others known and unknown, in operating Bayrock unlawfully, willfully, and knowingly conspired:

A. <u>*Klein* Conspiracy</u>. To defraud the IRS by impeding its lawful function in the evaluation, assessment, and collection of income taxes, in violation of 18 USC §371.

B. <u>Offense Conspiracy</u>. To commit the offenses enumerated in ¶16.A through ¶16.F and ¶16.J through §16.K, in violation nof 18 USC §371.

C. <u>Money Laundering Conspiracy</u>. To commit the offense(s) enumerated in ¶16.G through ¶16.I, in violation of 18 USC §1956(h).

18. <u>Private Rights of Action</u>. Plaintiffs' causes of action arise from these Defendants' commission of these tax, and other, crimes, at the interplay of federal racketeering law and state business organizations law and concomitant laws fiduciary, of contract, and of tort.

_____

[3] While Schwarz joined Bayrock in 2005, his *Pinkerton* liability extends back to the conspiracy origins in 2002.

BAYROCK GROUP LLC AND THE BAYROCK ORGANIZATION

19.   Bayrock is a New York-based group of real estate businesses which develops projects globally. Most of Bayrock's U.S. entities are contained in a hierarchy (the "Bayrock Hierarchy"):

A.   Bayrock Group LLC, is, and was at all times relevant, a duly organized and existing New York limited liability company. It is the top tier of the hierarchy, Bayrock's ultimate control parent. Who controls it controls the hierarchy, as it is the sole manager or managing member, and majority, plurality, or sole owner of membership interests in...

B.   A dozen or so commonly-controlled but not wholly-owned first-tier subsidiary limited liability holding companies ("Subs"), one Sub per real estate or similar project, each Sub in turn the majority, plurality, or sole owner of membership interests in...

C.   Second-tier (and sometimes lower-tier) limited liability companies developing the real estate projects, these companies almost always exclusively managed (sometimes co-managed) by Bayrock Group LLC and often having non-Bayrock members, typically outside partners and investors.

20.   Subs are passive holding companies, their only assets membership interests in lower tiers, their only function as conduits taking contributions from Bayrock Group LLC, contributing them further downstream to lower tiers, and receiving distributions from lower tiers, and distributing them further upstream to Bayrock Group LLC and other members. This action most concerns these five Subs, and in particular the first four (the "Four Subs").

A.   Bayrock Spring Street, LLC is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Trump SoHo hotel condominium project in New York.

B.   Bayrock Camelback, LLC is, and was at all times relevant, a duly organized and existing Arizona limited liability company. It is the holding company for Bayrock insider interests the Trump Camelback hotel condominium project in Phoenix.

6

C.   <u>Bayrock Merrimac, LLC</u> is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump International hotel condominium project in Fort Lauderdale.

D.   <u>Bayrock Whitestone LLC</u> is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Waterpointe mixed use project in New York City.

E.   <u>Bayrock Ocean Club LLC</u> is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump Ocean Club hotel condominium project in Fort Lauderdale.

THE BAYROCK RICO DEFENDANTS

21.   <u>Tevfik Arif</u> is a natural person residing in New York. Arif, a native Russian, started Bayrock as a party *apparatchik* in Moscow in 1989 at the fall of communism, backed by oligarchs and money they stole from the Russian people. He came to the United States in 2000 to establish a presence for Bayrock, forming Bayrock Group LLC in 2002. Until Satter joined, Arif had sole, if nominal, direct or indirect ownership and control of Bayrock Group LLC. He has always been a member and has always participated in its operation with the title "Chairman".

22.   <u>Felix Satter</u> ("Satter") aka Felix Sater, is a natural person residing in New York, a native Russian who emigrated to the United States in the 1970s. He joined Bayrock in 2002 with an organized crime history. By 2003, Arif had given him majority ownership in, and shared control of, Bayrock. He is been a member of all five Subs and of Bayrock Group LLC and has always participated in its operation, with the title "Chief Operating Officer" or "Managing Director".

23.   <u>Julius Schwarz</u> ("Schwarz") is a natural person residing in New Jersey. Bayrock hired him as Executive V.P. and General Counsel in early 2005, and since November 2005 he has been a member of all five Subs and of Bayrock Group LLC, and has always participated in its

7

operation, with dual roles as an attorney and an executive managing its normal operations; he considers himself *de facto* CEO.

PLAINTIFFS

24.     **Jody Kriss** ("Kriss") is a natural person residing in New York. He performed services for Bayrock from 2003 to 2007 and in 2008 as Director of Finance. Since no later than 2004 he has been a member of Bayrock companies and is a member of Bayrock Group LLC and all five Subs.

25.     **Michael Chudi Ejekam** ("Ejekam") is a natural person and United States citizen. Ejekam performed services for Bayrock from 2003 through 2006. Since 2005 Ejekam has been a member of two of the Four Subs, Bayrock Spring Street LLC and Bayrock Whitestone LLC.

ORGANIC LAW

26.     In all cases, specifically and without limitation in the cases of Bayrock Group, Bayrock Spring Street, Bayrock Camelback, Bayrock Merrimac, Bayrock Whitestone, and Bayrock Ocean Club, such default fiduciary duties apply among and between managers, officers, members, and the limited liability companies as exist under the applicable state law of their states of formation.

27.     Any minor variations in these states' default limited liability company fiduciary duty laws are immaterial to the core of this action. Arif, Satter, and Schwarz's malfeasance, especially fraud and defalcation, by their illegal operation of Bayrock Group LLC, alone or as the mediating agent for their further operation of the Subs or lower tiers to perpetrate fraud and defalcation.

28.     The private organic rules in the limited liability company agreements do not eliminate, materially *enhance*, or materially modify those status duties and liabilities for breaches thereof.

TAXATION

29.     Bayrock Group, Spring Street, Merrimac, Whitestone, Ocean Club, and all other Bayrock companies at all relevant times were and are tax partnerships unless otherwise stated.

8



Projects are owned by lower-tier companies. Outsiders are members of, contribute to, and get distributions from project lower tier companies. Bayrock's interests in lower tier companies are held in Subs, basically "special purpose Outsiders" conducting Bayrock's money in and out of projects. Bayrock Insider Sub members are usually service-providers who in return for services received compensatory membership interests entitling them to distributions, so typically do not contribute cash.

Arif, Satter, and since 2005 Schwarz control Bayrock Group LLC, which in turn is sole managing member of, and controls, the holding company SUBS, and is sole or co-managing member of, and controls or co-controls, the lower tiers as well.

FIGURE 1

9

THEORY OF THE CASE

30.     Plaintiffs bring this action primarily on account of Arif, Satter, and Schwarz's years of operating Bayrock companies for purposes including the continuous, related commission of criminal and civil frauds, largely but not entirely tax frauds, to wrongfully benefit themselves.

31.     <u>Mediating Agents</u>. Plaintiffs were direct and derivative <u>victims</u> of these frauds because of these Defendants' use of Bayrock companies, especially Bayrock Group LLC, as the mediating agents with which to commit them, whether or not Plaintiffs were also <u>targets</u> of the frauds.

32.     Stripped of visual complexity, Bayrock is a hierarchy of commonly controlled but not wholly owned limited liability companies taxed as partnerships. Arif, Satter, and Schwarz control the ultimate parent, Bayrock Group, and through control of Bayrock Group control all subsidiary and related lower-tier companies in the hierarchy. FIGURE 2.



FIGURE 2

33.     <u>Convergence</u>. From the standpoint of alleging injury caused by these Defendants' wrongful use of Bayrock companies as the mediating agents through which they committed these frauds in their own self-interest, the state law case and the RICO case are substantially the same:

34.     At the tax fraud core of this action, Plaintiffs have standing to sue Arif, Satter, and Schwarz, directly, derivatively, or both, depending on who suffered the injury:

        A.      <u>Under state law</u>, on account of their wrongful operation of Bayrock Group LLC for their personal benefit, in an effort to evade their own taxes, and for their fraudulent concealment of it, which causally injured Plaintiffs; and

        B.      <u>Under federal racketeering law</u>, on account of their operation of Bayrock Group LLC, in an effort to evade their own taxes, through a continuous pattern of related mail and wire fraud perpetrated against governments in an effort to defraud those governments of tax revenue and their opportunity to collect it, which causally injured Plaintiffs.

10

35.     There are two sovereigns. One makes illegal the betrayal of the Plaintiffs *qua* principals to whom fiduciary duties run and were breached and one makes illegal committing predicate acts the commission of which harmed the Plaintiffs and also breached those fiduciary duties.

36.     State Law. Without limitation, in each of Bayrock Group and the five Subs the managers and officers of owed the companies and members fiduciary duties, including duties of loyalty (including the duty to disclose) and care, and contractual duties of good faith and fair dealing.

37.     Doing Wrong. When Arif, Satter, and Schwarz used their control of Bayrock Group to act in their self-interest, whether by operation of Bayrock Group alone or by using Bayrock Group to operate other companies in the hierarchy, they breached their fiduciary duties of loyalty.

38.     Concealing It. When after wrongfully acting in their self-interest they concealed their own wrongdoing, they breached their fiduciary duties of disclosure and so also committed fraud. For example, when they used Bayrock companies to commit fraud to benefit themselves, then concealed their intent to defraud (their scienter), they breached fiduciary duties and committed fraud by concealment on the company and the members, because the principal is not deemed to "know" of his agent's deceit when the knowledge is concealed in the hands of that agent.

39.     Doing Wrong by Committing Tax Crimes. Arif, Satter, and Schwarz used their control of Bayrock companies to evade tens of millions of dollars of their personal income tax liabilities.

40.     One way they did this was to use Bayrock to skim millions of dollars of cash, giving Satter a million dollar a year unreported income and causing Bayrock Group to execute a sham "note" with him, a note Arif and Schwarz have admitted on MP3 was never meant to be repaid

41.     Another way they did this was to cause Bayrock companies to intentionally understate partnership taxable income, by at least $50,000,000 to as much as $100,000,000, causing Bayrock to prepare and file knowingly false K-1's and partnership tax returns as part of the fraud.

42.     These companies were tax partnerships, and partnerships do not pay tax, their partners pay tax on the partnerships' income, based on the distributive shares of income allocable to them.

11

43.     By intentionally understating Bayrock taxable income, since between them they owned the vast majority of Bayrock (most of it covertly by Satter), they captured the vast majority of the "benefit" of the understatement, and personally evaded tens of millions of dollars of tax.

44.     Thus they used Bayrock Group as the mediating agent to commit these tax crimes for their own benefit. They committed tax crimes, not tax mistakes. They acted with intent to evade.

45.     The causal injuries those companies and members suffered were not caused by any personal tax deficiency of Arif, Satter, or Schwarz's, but were caused by these Defendants' wrongful use of Bayrock to commit their personal tax evasion. The companies and members are thus victims of the tax frauds, or more precisely are victims of the companies' being hijacked to commit the tax frauds, even though they were not the primary targets of the tax frauds.

46.     For example, when Arif, Satter, and Schwarz caused Bayrock companies to underreport Bayrock taxable income in 2007 by $45,000,000 or more, and so underreported their own distributive shares of that income by almost all that much in the aggregate in order to evade their own taxes, there was causal injury to the companies and to the members whether or not any or all of these Defendants woke up the next day to find they inherited a $200,000,000 net operating loss wiping out all their illegally unreported Bayrock income and with it any tax deficiency.

47.     Even if such fortuitous elimination of tax deficiency had eliminated criminal liability for certain substantive tax crimes,, these Defendants would still be liable for Plaintiffs' injuries because the injuries are not created by the "success" of the tax crimes, but by the wrongful use, or hijacking, of Bayrock companies in the effort to commit them. The effort completes the wrong.

48.     Concealing the Tax Fraud. They committed tax fraud through Bayrock. Whether or not they hid the transactions they used to do it, they hid their scienter, their knowledge that what they were doing was fraud, from the company and from the members. Thus they not only breached fiduciary duty against Bayrock and its members by committing the tax fraud, they also then committed concealment fraud against Bayrock and its members by hiding the fact of their fraud.

49.   **Federal Law (RICO)**. The same principles apply in RICO. Importantly, Plaintiffs do not base their RICO case solely on federalization of state law breaches of fiduciary duty bootstrapped through honest services fraud, but on Arif, Satter, and Schwarz's pattern commission of predicate crimes for which RICO liability lies even if all fiduciary duties had been consensually eliminated.

50.   Those predicate acts are (i) that subset of the tax crimes, ¶16 *et seq.*, which are RICO predicates, e.g. money laundering to evade taxation; and (ii) their mail and wire fraud RICO analogs. Each of those tax tax crimes shares two facts which create that RICO analog liability:

  A.   Each crime was committed with the intent to deprive the United States and other taxing authorities, by fraud, of tax revenue or the opportunity to collect it.

  B.   Each crime was committed with the jurisdictionally significant use of mail or wire communications, even if ordinary course communications.

51.   It is settled federal law that schemes to defraud governments of tax revenue or the opportunity to collect it may be prosecuted under mail and wire fraud statutes, that tax and the opportunity to collect tax are property for purposes of mail and wire fraud, and that no tax deficiency is necessary, the mail and wire fraud statutes punishing the scheme and not its success.

52.   It has been settled law in this circuit for 20 years that a scheme to defraud governments of tax or the opportunity to collect it may be prosecuted under RICO with mail and wire fraud predicates, even where the predicates, such as filing false state tax returns, were not state crimes.

53.   Thus, Arif, Satter, and Schwarz's operation of Bayrock Group LLC to commit tax fraud; plus use of mail or wire; plus pattern; would support their criminal prosecution for RICO.

54.   It is now settled law that, as to predicate crimes of mail and wire fraud, a victim may have causal injury and thus RICO standing even if the victim was not the target of the fraud.

55.   Since both the companies and Plaintiffs suffered causal injury by reason of Arif, Satter, and Schwarz's operation of Bayrock Group LLC through this pattern of predicate crime (the common law "hijacking" concept, ¶45, as expressed in RICO terminology), alleged *infra*,

13

Plaintiffs, directly and derivatively can privately prosecute Arif, Satter and Schwarz for violating federal racketeering law by, *inter alia*, operating Bayrock Group LLC through a years-long pattern of mail and wire fraud intended to deprive victim governments of up to $100,000,000 or more of tax, whether or not the crimes "succeeded" in creating any tax deficiency.

56.     Concealing It. In addition, these Defendants' concealments of the tax frauds and related information in the presence of duties to disclose it are related predicate crimes, as in state law.

57.     Injury. These Defendants proximately caused the same or similar direct and derivative injury by their violations of state law as they did by their violation of federal racketeering law.

58.     Plaintiffs' Derivative Injury. As members of Bayrock limited liability companies, Plaintiffs have the standing to sue on behalf of those companies for their causal injuries.

59.     Derivative injuries includes legal and accounting fees Bayrock victim companies spent defending audits due to the frauds, like the 2007 audit of sham "loans" to Satter, ¶127; Bayrock funds misappropriated and illegally spent on fees paid to corrupt attorneys and accountants for their facilitation of these frauds, including as applicable money spent on bribing them to breach their fiduciary duties; partnership level penalties; and nonrefundable FICA, FUTA, and sate unemployment taxes never due but paid as part of the OWNERSHIP FRAUDS, *infra*.

60.     In addition, the companies themselves suffered injury when Arif, Satter, and Schwarz caused them to make illegal distributions or other dispositions of the proceeds of these crimes.

61.     Plaintiffs' Direct Injury I. When Arif, Satter, and Schwarz caused Bayrock companies to intentionally understate partnership income and issue fraudulent K-1's (or to fail to issue required K-1's), they fraudulently underreported all the partners' distributive shares of income, not just theirs. The expense the innocent partners incur in unwinding this, as such partner level penalties and legal and related fees as damages, is direct injury.

62.     Plaintiffs' Direct Injury II. Plaintiffs' membership interests in Bayrock companies entitle them to tax distributions equal to a percentage of these companies' partnership taxable income.

14

63.     Payment of this distribution is mandatory, automatic, and non-discretionary. The amount is computed mechanically as a fixed, objectively determinable function of partnership income. It is computed without regard to a member's individual tax circumstances. It is positively correlated with taxable income, so the greater the partnership taxable income the greater the distribution.

64.     This tax distribution provision is like a huge pendulum. Every time it realizes partnership income on an arc to the left, it must inexorably deposit a predetermined portion of that income as a tax distribution to Plaintiffs on its next arc to the right. It cannot be reasoned with. It does not think. It does not feel. It simply is. There is no "off" switch. It is eternal. It cannot be stopped.

65.     When Arif, Satter, and Schwarz executed schemes to fraudulently understate partnership income, causing the pendulum to pick up too little income on its arc left, Plaintiffs' tax distributions were illegally diminished, the pendulum foreseeably depositing too little to Plaintiffs on its arc right. Plaintiffs' failure to receive their due distributions is direct, not derivative, harm.

66.     Moreover, the diminutions in distributions were deliberate, not just foreseeable: Kriss recorded Schwarz and Arif admitting to him that they had used their control of Bayrock both to avoid tax by making it look like there were no profits when there really were and to cheat him and other minority members, who, Schwarz bragged, would as a result of their schemes never get any distributions. Arif even went on to praise Schwarz on that recording for fixing it so he, Satter, and Schwarz could keep all the money and not have to share it. In other words, they intended the schemes to defraud to encompass the loss of these distributions as well as their own tax evasion.

67.     Such intentional failure to make distributions is oppressive conduct. The harm is direct.

68.     Plaintiffs' Direct Injury III. In addition to causal injury by reason of the deprivation of their tax distributions, Plaintiffs have causal injury by reason of the deprivation of their opportunity to collect it, their chose in action. Plaintiffs have been injured by these Defendants' fraudulent concealment of the information needed to determine the existence and amount of taxable income and the existence and amount of due tax distributions and their need to sue for it.

15

69.     As part of their tax frauds, Arif, Satter, and Schwarz not only caused Bayrock companies to file dozens of fraudulent partnership returns and K-1's, they also caused Bayrock companies to fail to file dozens more returns and K-1's, sometimes pretending companies were disregarded entities so the transactions underlying the tax frauds could be buried on the wrong returns of other companies, and they failed to distribute required K-1's to Plaintiffs and other members.

70.     Then, they illegally refused Kriss's demands for access to Bayrock tax information, though state limited liability company statutes entitle Kriss to access them on demand and the limited liability company agreements of every company allow him the right to audit its books.

71.     As a result, Plaintiffs are unable to report their distributive shares and pay any tax due, and Kriss has had to sue for this information, suing Bayrock Spring Street LLC and Bayrock Whitestone LLC, Delaware companies, in a books and records action per 6 Del. Code §18-305.

72.     Plaintiffs' legal (and related) fees in bringing that and subsequent books and records action(s), motions, or orders to obtain the wrongfully withheld tax information, and for dealing, as a partner, with partnership-level IRS examinations and partner-level defenses are direct, not derivative, §1964(c) injury, legal fees as damages.

73.     <u>Causation Is Direct and Proximate</u>. Arif, Satter, and Schwarz had statutory and contractual duties to truthfully compute and report certain numbers, and the duty to pay Plaintiffs, without intervening decision, fixed, determinable, non-discretionary percentages of those numbers. For years they have operated Bayrock Group LLC through schemes to fraudulently under-compute those numbers. Whether those numbers were to be computed by reference to Fiji's annual sugar exports or by reference to the number of sunspots each July 4th or by reference to partnership items of income and loss is irrelevant; <u>there is but one step from fraud, the knowing under-computation of those numbers, to injury, the diminished distributions as a result.</u>

74.     "One step from fraud to injury" satisfies the causation requirement of §1964(c), and so also satisfies the causation requirements of state law breach of fiduciary duty and fraud.

75.     <u>Standing</u>. Plaintiffs are not sovereign entities. Paradigmatically, Plaintiffs <u>privately</u> "tax" these companies by their right to receive these information reports and tax distributions, so are essentially <u>private</u> attorneys general suing Arif, Satter, and Schwarz because their frauds deprived Plaintiffs of their <u>private</u> "tax" revenue and their <u>private</u> opportunity to collect it.

76.     Plaintiffs are quintessential RICO persons who suffered quintessential RICO injury to their quintessential RICO property by reason of quintessential RICO violations. Whether New York or any sovereign entity also suffered RICO injury *qua* lost tax or the opportunity to collect it and if so has standing to sue Defendants using RICO as a tax collection device is not at issue.

77.     <u>Vicarious Liability</u>. Plaintiffs assert vicarious liability under both state law and RICO.

78.     Under state law, Plaintiffs assert liability for aiding and abetting and civil conspiracy.

79.     Under RICO, Plaintiffs assert liability against those who agreed to knowingly facilitate Arif, Satter, and Schwarz's racketeering. As such claims are made pursuant to its conspiracy, §1962(d), not substantive, §1962(c), provisions, those Defendants, though accountants and attorneys, cannot hide behind *Reves*.

THE STORY

80.     <u>Bayrock Becomes a Mob-Owned Business</u>. The story began when Satter, a mobster and ex-convict (assault with a deadly weapon) infiltrated Bayrock in 2002. At the time, Satter was awaiting sentencing on federal racketeering charges for running a securities fraud syndicate in collaboration with the New York Mafia and Russian mob that deprived its victims of $40,000,000. By 2003 Satter had attained majority Bayrock ownership and shared control with Arif. From then, at all relevant times, Bayrock was largely a mob-owned and operated business.

81.     Running a mob-owned and operated business offered Arif and Satter a lot of difficulties, number one being they were running a mob-owned and operated business. No bank would lend for any project, no money partner would join any venture, no professionals would do any work.

82.    In addition, Satter's sentencing for racketeering was approaching. Most of the Russian and Mafia mob co-defendants he had testified against had been sentenced to incarceration and as much as $50,000,000 of restitution, and Satter, who in early 2003 began skimming what would become almost a million dollars a year from Bayrock, did not want to give it all up to his victims.

83.    **Concealing Bayrock's Owners.** Arif and Satter agreed to conceal Satter's majority ownership of the Bayrock Organization. They concealed it from Plaintiffs and others at Bayrock, including Plaintiffs. They concealed it, and his million dollar skimmed income, from his ███████████████████████████████. They concealed it, and his million dollar skimmed income, from the IRS. They concealed it from their partners. They concealed it from their lenders. They concealed it from their buyers, filing false condominium offering documents.

84.    It wasn't just Satter's ownership they concealed. For example, Arif and Satter had Bayrock Group LLC sell a mutual neighbor, Elizabeth Thieriot, some of its membership interests in Bayrock Ocean Club LLC, a holding company Sub, but never disclosed that she was an owner, omitting it from every document they showed any lender or partner. They did the same with everyone else who acquired ownership in any Bayrock company, including Plaintiffs, almost always concealing it from partners, lenders, and the IRS, and fraudulently representing that Arif owned 100% of everything, everywhere when that was almost laughably far from the truth.

85.    As alleged in detail in the OWNERSHIP FRAUDS section *infra*, for most of the relevant time in this action, especially from the 2006 filing of the fraudulent condominium offering documents for Trump SoHo on into 2008, not only did Satter own over 63% of the entire Bayrock Organization, but Arif was a far distant second, owning only about 18%. Not that anyone would know it from those condominium offering documents, which omit all mention of Satter entirely.

86.    **Concealing From Bayrock's Owners.** Their concealment ran to more than hiding the existence and identity of Bayrock owners from others; it also encompassed concealing material information from Bayrock owners, to whom they had fiduciary duties of disclosure, ¶36.

18

87.     For example, after Thieriot bought her membership interest in Ocean Club, it realized $1,500,000, which it distributed to its members. Rather than tell Thieriot and distribute her share to her, they hid this from her and embezzled her money. When she sued for access to Ocean Club's books and records, they denied she was a member, though they knew she was and were concealing what they knew was conclusive proof of her ownership from her, and from the Court.

88.     These examples pale in comparison with their concealment from Plaintiffs and other minority owners of the facts and circumstances of the 2007 taxable exchange, for $50,000,000 to $100,000,000, of 2/3 of the assets of a certain four holding company subsidiaries, the Four Subs.

89.     For months Arif, Satter, and Schwarz negotiated this as the sale for tax purposes that it really was, in which Plaintiffs and other minority owners should have shared millions of dollars.

90.     At the last minute, for two criminal purposes they well concealed from Plaintiffs, they purported to change the form to a sham "loan" and arranged it to exclude Plaintiffs and the others.

91.     The first purpose was to deprive Plaintiffs and others of their multi-million dollar share. Their mens rea became apparent later, in the form of spoken admissions, which Kriss recorded.

92.     The second purpose was to perpetrate a $250,000,000 scheme of money-laundering for purposes of tax evasion. Documents only recently surfaced evidencing their criminal mens rea.

93.     Relatedness. It is helpful to visualize the non-tax related concealment frauds and crimes in this action grouped according to:

    A.   Those which concealed Satter's majority ownership of Bayrock.

    B.   Those which concealed the identity of other, minority, owners of Bayrock.

    C.   Those which concealed information from Bayrock itself, as a matter of law (that is, where a duty of disclosure ran to a Bayrock company).

    D.   Those which concealed information from Bayrock's owners, as a matter of law (that is, where a duty of disclosure ran to one or more owners of a Bayrock company).

    E.   Those which concealed information other than ownership of Bayrock.

94. These five categories all mutually overlap, because one illicit transaction typically involved multiple concealments. Superimposed is the overarching theme of tax fraud, since tax frauds dominate this action and by themselves, given the 15 year forward money laundering tenor of that $250,000,000 scheme, ¶92, satisfy both closed and open continuity and relatedness. FIGURE 3.



FIGURE 3

95. Not every concealment was of ownership. Not every concealment of ownership was for tax fraud[4]. Not every tax fraud relied on concealed ownership[5]. Not every concealment of ownership involved Satter, or only Satter. But, as the diagram shows, all the frauds were related to each other, and all satisfy *Daidone* relatedness, all related to the enterprise and all with the common goal of lining the pockets of Arif, Satter, and Schwarz with the proceeds of their racketeering.

96. **The Story (cont'd)**. When Plaintiffs joined Bayrock in 2003, Arif and Satter told them Satter had a "nominal" interest in the firm, only in subsidiaries, and while he had a prison record for assault, he was turning his life around. Because his guilty plea to criminal RICO, proffer, and cooperation agreement, Exh. A, were sealed as he was aiding the prosecution of his Mafia and Russian organized crime confederates, Arif and Satter were able to hide his history of securities fraud, money laundering, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ from Plaintiffs and

---

[4] For example, as alleged, ¶84, the Bayrock RICO Defendants often concealed all the owners other than Arif from lenders, to hide Satter and to hide their perpetual violation of loan covenants which required certain Bayrock Subs to be bankruptcy remote single purpose entities, which they were not.

[5] However, every tax fraud impacted every partner. By partnership taxation, Bayrock's criminally fraudulent tax accounting harmed all the partners, even the innocent, who received either fraudulent K-1's, or no K-1's at all as part of the concealment of their status and identity from the IRS, and who received illegally diminished tax distributions, or no tax distributions, as a proximate result of the illegally understated Bayrock partnership taxable income.

others for almost five years, though Schwarz, who joined in 2005, learned the truth by 2007 and used it in an attempt to extort Arif and Schwarz, *Infra*.

97.     Plaintiffs agreed to join Bayrock, as did others, because Arif and Satter promised them "sweat equity", with comparatively modest, or no, regular additional cash compensation.

98.     This meant these service providers' ultimate compensation would be heavily dependent on the entrepreneurial success of Bayrock operations; this was the essence of all their bargains.

99.     Sometimes, as with Ejekam, the sweat equity was limited in scope to depend on the success of specific projects, and sometimes, as with Kriss and Schwarz, it was broadly scoped to depend on the success of almost every project in the Bayrock Organization.

100.    Sweat equity rights were encapsulated in, and conveyed to service providers by having Bayrock companies issue them, membership interests, making them members.

101.    Those service providers whose sweat equity was limited in scope received membership interests in one or more Subs. For example, referring to the EQUITY CASH FLOW diagram, Pg. 2, Ejekam, whose sweat equity was limited in scope to the Trump SoHo and Waterpointe projects, received membership interests in Bayrock Spring Street LLC and Bayrock Whitestone LLC.

102.    Those service providers whose sweat equity was broadly scoped, like Kriss and Schwarz, received membership interests in all five Subs, plus membership interests in other companies, including Bayrock Group LLC itself. Satter's membership interests were also broadly scoped, while Arif has had membership interests only in Bayrock Group LLC.

103.    Thus, as the projects paid off and cash flowed up from the lower-tier companies, what remained after Bayrock outsiders got their distributions from lower tiers would eventually flow upstream to the Subs, and once there, the limited scope and broad scope service providers and Satter would get their distributions, the remainder distributed upstream to Bayrock Group LLC, where Arif, Satter, and the broad scope service providers would get additional distributions.

104.    At least this is what was supposed to happen. It did not.

21

105.   What Plaintiffs did not know as they joined and worked there, and could not have known, was that, far from turning his life around, Satter had joined with Arif, and later also with Schwarz, to run-ran Bayrock as their private piggy bank, with no regard for the fiduciary and contract duties they owed Plaintiffs and others, in contempt of criminal law as well, operating Bayrock Group LLC, an evolving joint criminal enterprise, through a pattern of racketeering to line their pockets with as much as possible, especially with the proceeds of crime.

106.   They began to find out when things went well and their membership interests were worth over $32,500,000 and Arif, Satter, and Schwarz stole it from them, and millions from other minority members, as part of a conspiracy to evade $100,000,000 of tax, the crimes tainting not only Trump SoHo, LLC, but Trump International, Trump Camelback, and Waterpointe as well.

107.   How they, conspiring with other Defendants, did this is but one of the criminal subplots in this case which make clear Plaintiffs' RICO standing and together tell the rest of the story.

THE SUBPLOTS

108.   The Satter Frauds 1. By 2003 Satter infiltrated, owned and controlled most of Bayrock, even while still awaiting sentencing for his racketeering conviction. Most of his 20 Russian and Mafia-mob confederates in that case, against whom he gave evidence, by then had been convicted of racketeering and sentenced to incarceration plus multi-million-dollar restitution orders, so Arif let Satter skim nearly $1,000,000 a year from Bayrock, illegally unreported and untaxed, not only to evade tax by pretending they were "loans" but also to obstruct justice by defrauding the U.S. Probation Officer in the preparation of Satter's presentencing investigation report, concealing Satter's income from Bayrock ███████████████████████████████, in an effort to evade a heavy restitution order. The skims continued for years, reaching almost $5,000,000.

109.   The Cayre Frauds Using artifices to defraud designed by Defendant Akerman Senterfitt in conspiracy with them, Arif, Satter, and New York developer Michael Samuel defrauded the

22

Cayre family by hiding the fact that in breach of Samuel's agreement with the Cayres prohibiting such, for years Arif, Satter, and Samuel used Bayrock Group LLC to front all the money for, and covertly own 90% of, Samuel's 50% interest in a condominium project he owned 50:50 with the Cayres. When the project succeeded and paid off, to evade taxes Arif, Satter and Schwarz had Bayrock intentionally fail to report its share of its millions of dollars of profit from that project.

110.    The Thieriot Frauds. Arif and Satter had Bayrock Group LLC sell membership interests Bayrock Ocean Club LLC to Elizabeth Thieriot at almost $1,000,000 profit, then to evade tax had Bayrock intentionally fail to report it. When Ocean Club later realized $1,500,000m Arif, Satter, and Schwarz had it distribute all the money to Bayrock Group, embezzling Thieriot's share. She sued Ocean Club in New York. Bayrock and Akerman Senterfitt deceived her, and the Court, by arguing she was not a member and Ocean Club was not subject to New York jurisdiction, though they knew Ocean Club's only office was in New York and they knew she was a member, having found proof in their files (they kept asserting she was not a member until she showed up in court with her own copy of that proof; only then did Akerman told Arif, Satter, and Schwarz to give up the deceit since Thieriot had introduced in court the proof they already had and knew to be true).

111.    The Ownership Frauds. Plaintiffs and others, including Satter and Schwarz, were partners in Bayrock companies, ¶100, for general, and specific tax, reasons. Arif, Satter, and Schwarz committed tax fraud treating partners as employees, taking millions of dollars of illegal deductions and capitalizations and evading hundreds of thousands of dollars of unincorporated business tax. Bayrock's accountant, Alex Salomon of Salomon & Co., was key in this and the other tax frauds, knowingly preparing dozens if not hundreds of fraudulent returns and schedules.

112.    The FL Frauds. In 2007, Arif, Satter, and Schwarz estimated the Four Subs might soon receive distributions of $227,000,000 from the lower tier entities for the Four Projects.

113.    By then, because of the conveyances of compensatory membership interests in the Subs to Plaintiffs and other service providers, ¶97, Bayrock Group LLC owned only about 33% of the

23

membership interests in the Four Subs, Plaintiffs and others the others 67%, and Plaintiffs' share of that expected $227,000 was about $32,500,000.

114.    Arif, Satter, and Schwarz stole this by converting most of Plaintiffs' and the others' membership interests in the Four Subs and exchanging them, along with most of Bayrock Group LLC's membership interests, to co-conspirator FL Group ehf ("FL") for $50,000,000, keeping all the money and repudiating what little of Plaintiffs' and others' membership interests were left.

115.    The exchange was part of a larger deal whereby FL became Bayrock's new partner. The new partners agreed to work together on the existing Four Projects and on so much of $2,000,000,000 worth of new projects as they might "agreed to agree" to develop together.

116.    All this was to the exclusion of Plaintiffs and other minority members in the Subs, who should have shared millions of dollars of the $50,000,000 and a share of the new projects.

117.    Knowing he and others would be sued for this, Schwarz had Bayrock purchase a $5,000,000 D&O policy from AIG before the FL sale closed to try to stick AIG with the liability, submitting a fraudulent application which concealed that he and others had been sued only weeks earlier for racketeering, fraud, and breach of fiduciary duty in connection with Trump Camelback.

118.    Arif, Satter, and Schwarz made the deal with FL even though they had better offers.

119.    Part of the reason was FL's willingness to conspire in the theft of Plaintiff's interests.

120.    Part of the reason was the new business: because Bayrock Group would contribute 25% of the capital but get 50% of the profits, the value to Arif, Satter, and Schwarz *qua* Bayrock Group was that of a "free ride" profits interest on that $2,000,000,000 worth of new projects.

121.    And part of the reason was a side deal, where Arif, Satter, Schwarz, and FL agreed to perpetrate $100,000,000 of money laundering and tax evasion, benefitting Arif, Satter, and Schwarz by allowing them to evade $20,000,000 of their personal income tax liabilities immediately and in return benefitting FL by allowing it to evade $80,000,000 of tax over time.

24

122.    Roberts & Holland, facilitated by Duval & Stachenfeld, built the artifices to defraud, illegal money laundering and tax shelter structures for Bayrock and FL to use with FL whereby:

  A.    They formed a sham domestic tax partnership as a mere conduit between Bayrock in New York and FL in Iceland, to pretend this sham partnership, not FL, was Bayrock's new partner to evade $80,000,000 of foreign partner withholding. Roberts called this a "domestic holding partnership". Plaintiffs call it money laundering to evade taxation.

  B.    They disguised FL as a "lender", not a partner, to pretend the $50,000,000 was nontaxable "loan" proceeds rather than taxable proceeds of a sale of partnership interests. Arif, Satter, and Schwarz thus evaded up to $20,000,000 of their personal tax liabilities[6].

  C.    They agreed to disguise $200,000,000 of effectively connected income FL expected to realize in respect of its partnership interests as "contingent interest" on the "loan" so Bayrock could fraudulently deduct, and FL fraudulently exclude, it from income, evading $80,00,000 of FL's tax liability (thus the need for foreign partner withholding evasion).

123.    When Kriss objected to all this, Satter made him an offer he couldn't refuse: either take $500,000, keep quiet, and leave all the rest of his money behind, or make trouble and be killed.

124.    Given Satter's criminal history of kidnapping, illegal possession of assault weapons, assault with a deadly weapon, and recent threats to torture, kill, and dismember another Bayrock partner, Ernest Menes, if he didn't stop complaining that Satter was skimming from Trump Camelback, this was no idle threat. Kriss took leave from Bayrock after the extortion.

125.    **The Satter Frauds II.** By late 2007, Satter's $1,000,000 skims had reached $3,750,000. Pursuant to a "note" he executed in 2006, with "interest" he "owed" nearly $5,000,000, but Arif, Satter, and Schwarz always understood and considered the note to be a sham; Kriss even recorded

---

[6] Disguising the sale as a "loan", Arif, Satter, and Schwarz had Bayrock understate income by $42,000,000, automatically understating all partners' distributive shares of income by $42,000,000 and eliminating $20,000,000 of tax distributions. This one step, Arif, Satter and Schwarz understating partnership income to evade their own tax, as a result automatically caused understatement of other partners' income and loss of their tax distributions, a RICO injury.

25

Schwarz in 2008 admitting that to him, personally, in the presence of Arif, and implying they had withheld material information from the IRS during a 2007-2008 audit concerning that skim.

126.    Schwarz encouraged the New York Times to run a story about Satter's mob ties, Exh. B, then used the negative publicity in an attempt to extort Arif and Satter into giving him Bayrock.

127.    Schwarz "suggested" Arif let Bayrock Group LLC redeem his membership interests for $6,000,000 and "suggested" Satter let Bayrock Group LLC use $5,000,000 to pay his personal tax debt and abandon his membership interests, or Schwarz would turn them in to the IRS, which was then auditing Bayrock Group LLC's 2004 return and was very interested in the sham "loan".

128.    Arif refused to submit to extortion, and Satter, who knew about extortion, proffers, and cooperation agreements, knew Schwarz would not turn anyone in because Schwarz was up to his eyeballs in tax fraud and other crime and would never get immunity, so he also refused to submit.

129.    Bayrock's audit problems tripled when iStar, $275,000,000 Trump SoHo lender, unhappy the article made them seem to be financing Mafia and Russian mobs, demanded to audit Bayrock, followed by the Sapirs, Bayrock's Trump SoHo partner, demanding a forensic fraud audit.

130.    In response, Schwarz told Salomon to give misleading information to the auditors, telling him to disguise the $5,000,000 Satter "loan"; conspired with Halberg to conceal Satter's Bayrock ownership from iStar; then retained Defendant Nixon Peabody to convince Arif Satter had to go.

131.    Arif, Satter, Schwarz, Salomon, and Nixon conspired to, and did, defraud the IRS, filing false schedules and returns saying Satter was a Bayrock Group LLC employee "paid" $4,200,000 of "loan cancellation" wages in 2007, paying the IRS $1,600,000 of "withholding" on his behalf.

132.    This was fraud. There was no "debt" and if there had been its cancellation could not have been wages because it has been black letter law for forty years that payments by a partnership to a partner are not wages for federal income tax purposes, and Nixon knew this and knew Satter was a partner, bemoaning the fact in emails and hand-wringing how to get away with it.

26

133.    An email from the same Nixon partner strongly suggests that some or all of Arif, Satter, Schwarz, and Salomon obstructed the United States Government Department of Treasury by making false statements to the IRS in a 2007 audit of the 2004 partnership return and $3,750,000 Satter "loan", apparently testifying that Satter was an employee, which they knew was false.

134.    The sham $1,600,000 "withholding" was a pretext to pay Satter's personal tax debt with misappropriated Bayrock money, so was $1,600,000 of unreported taxable income to him, and they knew it, and knew the amount was $1,000,000 low, that he owed more like $3,000,000, and knew they were evading $600,000 of interest and penalties, and the made-up $4,200,000 salary was a pretext to wipe the "loans" off the books, yet they filed the returns and schedules anyway.

135.    They filed the returns and schedules even though a tax partner at Nixon Peabody warned that if they did they risked years in prison for criminal tax avoidance.

136.    The Nixon partner responsible for Bayrock told them to ignore his tax partner's warning of prosecution, saying if there were criminal charges they should all claim to have relied on Salomon's advice in filing the fraudulent returns and schedules.

137.    Nixon and Akerman then went on to assist with the Satter cover-up and sham agreement to "separate" from Bayrock, which let Satter keep the $5,000,000 he "owed", the unpaid "principal" and accruing "interest" never to be spoken of; gave him $52,000 a month; let him transfer his Bayrock membership interests into a trust so he could pretend not to be an owner; and paid him $1,500,000 misappropriated from Bayrock, also illegally untaxed and unreported, disguised as an "investment" in a sham Delaware corporation, Bayrock Group Inc., Bayrock had never used since its formation, which Satter would purportedly use for some kind of "business".

138.    He also got an agreement to be paid millions of dollars to help the Cayres buy back Bayrock's interest in a joint project he himself had insisted Bayrock buy into in 2007, to be paid to a Netherlands Antilles shell, just as he hid income and assets in his prior racketeering crimes.

27

THE CONSPIRATORS

139.    Arif, Satter, and Schwarz didn't commit these crimes and other wrongful acts alone. In
their direct or derivative capacities Plaintiffs allege the following Defendants are liable for,
variously, conspiracy to violate federal racketeering laws; civil conspiracy in the commission of
or aid and abetment of Arif, Satter, and Schwarz's state law wrongs; and their own violations of
substantive state law, including breaches of their own fiduciary, contract, and professional duties.

140.    Akerman Senterfitt conspired with Arif and Satter to perpetrate mail and wire fraud on
the Cayres, aided and abetted Michael Samuels' breach of fiduciary duty he owed the Cayres, by
doing so aided and abetted Arif and Satter's breach of fiduciary duty they owed Bayrock, and
conspired with Arif, Satter, and Schwarz to deprive Elizabeth Thieriot of her member rights,
aiding and abetting the breach of fiduciary duties they owed her and Bayrock by corruptly filing
deceptive court papers and withholding documents to frustrate her proper exercise of those rights,
and have suborned perjury in a scheme to fraudulently conceal Satter's Bayrock ownership.

141.    Roberts & Holland joined with Arif, Satter, Schwarz in conspiracy to commit money
laundering to evade tax, counseling them to form the sham tax laundromat entity and to disguise
the sale, for tax purposes, of partnership interests as a sham "loan" and effectively connected
income as sham "contingent interest" all while tortiously interfering with Plaintiffs' contracts and
aiding and abetting Arif, Satter, and Schwarz in embezzling from their minority partners and
oppressing them to the point of repudiating their membership interests. Moreover, Roberts
intentionally inflicted this harm on their own client Kriss. They engaged to be in attorney-client
relationships with Bayrock entities and also, simultaneously, with Arif, Satter, Schwarz, and
Kriss, yet never obtained conflict waivers or advised Kriss of conflict. They obeyed Schwarz's
direction to ignore his interests, so were bribed to deprive him of their honest services.

142.    Duval & Stachenfeld joined in conspiracy with Roberts & Holland and the other FL
Fraud conspirators, drafting the documents for the FL Fraud and issuing knowingly or recklessly

false "safety" opinions while knowing the transactions and consequences that would ensue would violate civil and criminal law, in so doing tortiously interfering with Plaintiffs' contracts and aiding and abetting Arif, Satter, and Schwarz in breaching their fiduciary duties to Plaintiffs and others and in their embezzlement, oppression, and repudiation of Plaintiffs and their rights.

143.    **Alex Salomon and Salomon & Co.**, Bayrock's accountants, participated in planning and executing almost every if not literally every one of their tax frauds, as an accountant by preparing numerous fraudulent Bayrock returns and schedules and as more than an accountant, as a trusted business advisor, breaching his concomitant fiduciary duties to Bayrock entities as well as aiding and abetting the breach of others' duties to Plaintiffs.

144.    **Nixon Peabody** conspired with Arif, Satter, Schwarz, and Salomon in the commission of the tax crimes associated with the cover-up of Satter's millions of dollars of skims and the preparation and filing of fraudulently returns and schedules falsely characterizing him as an employee, aiding and abetting their breaches of fiduciary duty to the company by facilitating the misappropriation of its assets, including without limitation the $1,600,000 illegally disguised as withholding and used to pay Satter's personal tax liabilities.

145.    **Mel Dogan**, an attorney representing both Bayrock and Arif, conspired with Arif, Satter, and Schwarz in the FL Frauds by participating in the negotiation and translation of all the documents for Arif and counseling him to go ahead with the transaction even while knowing from his knowledge of Bayrock and its ownership structure that Arif's agreement would breach Arif's fiduciary duties to Plaintiffs and others, including Bayrock itself, Dogan's own client.'.

146.    **Brian Halberg**, who like Schwarz is both a general executive as well as in-house attorney at Bayrock, conspired with Arif, Satter, and Schwarz in defrauding auditors and lenders by giving them false or misleading information and conspired with them in their continuing tax frauds by wrongfully refusing Kriss's rightful demands for tax information, including without limitations K-1's and tax returns, depriving him of his opportunity to collect his tax distributions.

29

AD DAMNUM

147.    Plaintiffs unwittingly became minority members in and creditors of an organized criminal enterprise operated through perjury, embezzlement, tax evasion, extortion, bribery, and fraud.

148.    They did not bargain for this. That they were induced to associate with criminality is a renouncement of the essence of their bargain, that the parties consensually bound themselves in relationships mutually understood to be governed by the rule of law, not the rule of the Mafia.

149.    Plaintiffs seek monetary and equitable relief in two overarching alternate sets of theories:

A.    Rescissory. Plaintiffs acquiesce to the renouncements. Regardless of label, rescission for repudiation or anticipatory breach, forced buyout for majority oppression and squeeze-out, or voidance for fraud in the inducement, and regardless of jurisprudence in law or equity, Plaintiffs seek judgment that Defendants abrogated the relationships. Plaintiffs' chiefly plead the FL Frauds were repudiations of their memberships and pray for lost profit damages in an amount determined at trial, likely in excess of $25,000,000.

B.    Remedial. Alternatively, Plaintiffs hold Defendants to their bargains, and seek to remedy the direct and derivative harm done them. They seek to recover the distributions they failed to receive; the imposition of constructive trusts; the voidance of distributions from all Bayrock limited liability companies and other fraudulent transfers; declaratory judgments, and judicial dissolution of every juridical entity in the Bayrock Organization.

150.    Plaintiffs in addition, seek relief in RICO:

A.    Legal. Pursuant to §1964(c), Plaintiffs seek treble damages for their causal injury as pled subsequently *infra*, plus attorneys' fees and costs.

B.    Equitable. Pursuant to §1964(a), Plaintiffs seek equitable relief, including judgments from the Court divesting each Defendant of all interests in Bayrock; ordering each Defendant to disgorge the amount by which he was unjustly enriched; and ordering the dissolution, winding up, and terminal liquidation of all Bayrock entities.

30

## JURISDICTION AND VENUE

151.    This Court has jurisdiction pursuant to 28 USC §1331, the action arising under the laws of the United States; and 28 USC §1367(a), all other claims not arising under the laws of the United States so related to claims in this action that they form part of the same case or controversy under Article III, including claims that involve the joinder of additional parties.

152.    Venue is proper pursuant to 28 USC §1391(b)(2), a substantial part of the events or omissions giving rise to the claims occurring within this district, and a substantial part of property the subject of the action situated within this judicial district; and 28 USC §1391(b)(3), Defendant Bayrock Group LLC found within this district and Defendants not all residing in the same state.

31

## RULE 23.1 STATEMENT

**PLAINTIFF KRISS ATTESTS:**

153.    I am now and have been a member of, owning membership interests in, derivative Plaintiffs Bayrock Group LLC, Bayrock Spring Street LLC, and Bayrock Whitestone LLC continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**PLAINTIFF EJEKAM ATTESTS:**

154.    I am now and have been a member of, owning membership interests in, derivative Plaintiffs Bayrock Spring Street LLC, and Bayrock Whitestone LLC continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**PLAINTIFFS KRISS AND EJEKAM BOTH ATTEST:**

155.    This action is not a collusive one to confer jurisdiction the court would otherwise lack.

156.    Demand would be futile. This is stated this with the following particularity:

157.    Defendants Arif, Satter, and Schwarz control Bayrock Group LLC, and have controlled it each alone, and together in combination, since no later than 2002 in the case of Arif, 2003 in the case of Arif and Satter, and 2005 in the case of Arif, Satter, and Schwarz.

158.    During those periods, they have not only controlled it, but dominated it to the extent they are and have been the sole f persons having *de jure* or *de facto* control over it. There are no other persons in the nature of independent managers or directors who could contest or overrule them. In particular, throughout these times Defendant Arif has been the only member of Bayrock Group LLC, which is member managed, whose membership interests have voting rights.

159.    Through their control of Bayrock Group LLC they exercise both *de jure* and *de facto* control over all other Bayrock entities relevant to this action, including without limitation Spring Street and Whitestone, of which Bayrock Group LLC is the sole manager.

160.    This Complaint in general and the derivative causes of action in particular are predicated on the continued, wrongful operation of these three derivative Plaintiffs for the personal benefit of (i) Arif, Satter, and Schwarz, as to Bayrock Group LLC; and (ii) Bayrock Group LLC, Arif, Satter, and Schwarz, as to Bayrock Spring Street LLC and Bayrock Whitestone LLC.

161.    The acts complained of include not just civil wrongs but criminal acts of money laundering, tax evasion, perjury, obstruction of justice, mail fraud, wire fraud, bribery, honest services fraud, extortion, and embezzlement of a degree and nature and in respect of amounts so large that federal sentencing guidelines for a comparable criminal action would be in the decades.

162.    None of Arif, Satter, or Schwarz can be expected to adequately pursue civil action against themselves which could result in such possible subsequent criminal liability, particularly where liability would depend on their own culpable mental state (mens rea or scienter).

163.    Moreover, these acts complained of, for example the tax evasion, were acts whereby these Defendants used these derivative Plaintiffs as mediating agents to commit the crimes and related wrongs predominantly by engaging in transactions with third parties, many named as conspiracy Defendants in this action, in which they stood on both sides of the transaction, either directly, for example in the FL transactions whereby they stripped tens of millions of dollars of assets from Bayrock subsidiaries, including Spring Street and Whitestone, in order to gain access to $50,000,000 cash for the direct benefit of Bayrock Group and themselves personally, or constructively, because of conspiracy with the "other side", and so they are self-interested.

164.    Moreover, no reasonable persons controlling these entities would, in the exercise of proper business judgment, commit these crimes and related civil wrongs, let alone on such terms.

33

165.   Finally, Kriss has made attempts to gain access to the books and records of Spring Street and Whitestone by proper demand and has been refused, and there is no reason to believe demand for action would meet with any different result other than refusal.

34

## PARTIES AND PERSONS OF INTEREST

**DEFENDANTS**

**BAYROCK GROUP LLC AND CERTAIN SUBSIDIARIES**

166.    Most of Bayrock's U.S. entities are contained in a hierarchy (the "Bayrock Hierarchy"):

    A.    **Bayrock Group LLC,** is, and was at all times relevant, a duly organized and existing New York limited liability company Its principal place of business is New York.

167.    Subsidiaries ("Subs"), each controlled by Bayrock Group LLC as sole managing member, but none wholly owned by Bayrock Group, are passive holding companies, their only assets membership interests in lower tiers. Each has its principal place of business in New York.

    A.    **Bayrock Spring Street, LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Trump SoHo hotel condominium project in New York.

    B.    **Bayrock Camelback, LLC** is, and was at all times relevant, a duly organized and existing Arizona limited liability company. It is the holding company for Bayrock insider interests the Trump Camelback hotel condominium project in Phoenix.

    C.    **Bayrock Merrimac, LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump International hotel condominium project in Fort Lauderdale.

    D.    **Bayrock Whitestone LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Waterpointe mixed use project in New York City.

    E.    **Bayrock Ocean Club LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump Ocean Club hotel condominium project in Fort Lauderdale.

35

THE BAYROCK RICO DEFENDANTS

168.   Tevfik Arif ("Arif") is a natural person residing in New York.

169.   Felix Satter ("Satter") aka Felix Sater, is a natural person residing in New York.

170.   Julius Schwarz ("Schwarz") is a natural person residing in New Jersey.

THE RICO CONSPIRACY DEFENDANTS

171.   Brian Halberg ("Halberg") is a natural person residing in New York.

172.   Salomon & Company, PC ("Salomon & Co.") is, and was at all times relevant, a duly organized New York professional corporation.

173.   Alex Salomon ("Salomon") is a natural person residing in New York.

174.   Jerry Weinrich ("Weinrich") is a natural person residing in New York.

175.   Roberts & Holland, LLP ("Roberts") is, and was at all times relevant, a duly organized New York limited liability partnership.

176.   Elliot Pisem ("Pisem") is a natural person residing in New York.

177.   Duval & Stachenfeld, LLP ("Duval") is, and was at all times relevant, a duly organized New York limited liability partnership.

178.   Bruce Stachenfeld ("Stachenfeld") is a natural person residing in New York.

179.   Craig Brown ("Brown") is a natural person residing in New York.

180.   David Granin ("Granin") is a natural person residing in New York.

181.   Mel Dogan ("Dogan") is a natural person, residing and in New York.

OTHER DEFENDANTS

182.   Akerman Senterfitt LLP ("Akerman") is, and was at all times mentioned herein, a duly organized Florida limited liability partnership.

183.   Martin Domb ("Domb") is a natural person residing in New York.

36

184.   **Nixon Peabody, LLP** ("Nixon") is, and was at all times relevant, a duly organized New York limited liability partnership.

185.   **Adam Gilbert** is a natural person residing in New York.

186.   **Bayrock Group, Inc.** is, and was at all times relevant, a duly organized Delaware corporation.

187.   **Michael Samuel** is a natural person residing in New York and Florida.

188.   **Salvatore Lauria** is a natural person residing in Connecticut and Florida.

189.   **National Union Fire Insurance Co. of Pittsburgh, PA.** is, and was at all times relevant, a duly organized Pennsylvania corporation.

190.   **John Does 1-50** are "Company Entities", as defined in ¶425, their identity unknown.

191.   **John Does 51-100.** Are a certain trust settled by Satter in 2008 and such other juridical entities, as defined herein, through which he has participated in Bayrock activities.

PLAINTIFFS

192.   **Jody Kriss** ("Kriss") is a natural person residing in New York.

193.   **Michael Chudi Ejekam** ("Ejekam") is a natural person and United States citizen.

NON-PARTIES OF INTEREST

194.   **Beau Woodring** is a natural person residing in Arizona.

195.   **FL Group ehf** is an Icelandic investment company, since 2008 known as Stodir.

196.   **Elizabeth Thieriot** is a natural person residing in California.

197.   **Cayres** are a family of natural persons, investors and developers residing in New York.

198.   **Maria Simonchy** is a natural person residing in New York. She has always been at all relevant times Arif's email agent, unless otherwise stated all emails addressed to her are alleged to have been received by Arif and all emails sent by her are alleged to have been sent by Arif.

## ALLEGATIONS

### THE SATTER FRAUDS I

#### SATTER'S INFILTRATION INTO BAYROCK

199.    Soon after Arif formed Bayrock Group LLC in 2002 as the ultimate control parent of the Bayrock Hierarchy, Satter joined Bayrock. He had been working as a commission broker, trying to raise money for development companies; one of his few successes was a deal on a Florida project to be done jointly by New York developer Michael Samuel and a New York family, the Cayres.

200.    As a success fee for brokering that deal, called Midtown Miami, Satter was paid in kind in the form of a personal option to buy a membership interest, conveying a 5% profit interest, in one of the project limited liability companies (a Midtown Miami "Sub") for $450,000.

201.    Claiming not to have the cash, Satter got permission for his neighbor Arif to have Bayrock pay the $450,000 for 50% of Satter's 5%. They formed Bayrock Midtown LLC, one of the first Subs. Bayrock Group LLC took 100% of the membership capital interests in Bayrock Midtown and Bayrock Group LLC and Satter each took 50% of the membership profits interests, then Bayrock Group LLC contributed $450,000 to Bayrock Midtown which contributed it on to the Midtown Miami Sub, receiving in return 5% of its membership interests.

202.    Meanwhile, between 2000, when he had just come to the United States, and that time in 2002, Arif, using the progenitor of what was becoming Bayrock, had started several development projects and, most prominently, had acquired a large income project, Loehmann's Plaza in Brooklyn, for which he paid about $16,000,000 and would sell in a few years for $23,000,000.

#### PRIOR CONVICTION FOR CRIMINAL RICO

203.    When Satter infiltrated Bayrock in 2002, he was awaiting sentencing for his guilty plea for violating criminal RICO, ███████████████, Exh. A., revealing his participation in securities fraud, money laundering, ████████████████████

████████████████████████████████████████████
████████████████████

204.    Satter committed these crimes in connection with his founding (with several partners in crime, one of whom, Sal Lauria, he would take with him to Bayrock) and operation of a Russian and Mafia stock brokerage "pump and dump" operation variously known as "White Rock Partners" and "State Street Capital Markets", which defrauded its victims of $40,000,000[7].

205.    Although he████████ and agreed to cooperate in 1998, Exh. A, Satter was not convicted until 2004, Exh. C, well within the 10-year window of FRE 609(b), and the nature and degree of his crimes, the number of victims and the amount they were defrauded of, about $40,000,000, would qualify for the 609(b) exemption in any event.

206.    His criminal activities eventually attracted the attention of the FBI's Russian organized crime squad, largely because he and a Russian mob confederate, Gennady Klotsman, who has since returned to Russia after serving his term for these crimes, left a locker full of incriminating documents and TEC-9 assault weapons without paying the rent and it was eventually broken into by the owner. Their ensuing investigation culminated in a 1998 ████████████████

---

████ was deposed Marcy 9, 2010 in *Bernstein v. Bayrock Group LLC*. Here is his testimony about his racketeering:

Q.      Were you ever convicted of a crime?
A.      Yes.
Q.      What was the crime you were convicted of?
A.      I was convicted of assault one.
Q.      Were you ever convicted of any other crimes?
A.      On the advice of counsel, I am not going to answer that question as I don't have to incriminate myself nor does this business litigation have anything to do or bearing on whether I am convicted of any crimes or not. On the advice of counsel, I won't answer past what I have already answered.
Q.      You already answered you were convicted of assault?
A.      Yes.
Q.      If you have actually been convicted, the fact that you have been convicted cannot constitute any testimony against your own interests and goes to your credibility depending upon what the nature of conviction was and if it goes to a conviction related to something related to any sort of fraud, et cetera, it is relevant to your credibility as a witness in this case.
A.      Probably not a very credible witness to begin with.

39

██████████████████████████████████████ resulting in Satter's proffer, guilty plea, cooperation agreement, and sentencing on federal racketeering charges (Klotsman pled guilty and was sentenced to 71 months in jail and $49,999,999 in restitution).

207.   His frauds█████████████████, include:

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

The securities frauds conducted through White Rock, commonly referred to as "pump and dump" schemes, went essentially as follows. ████████ Satter secretly acquired large blocks of stock of publicly traded companies, including Holly Products Inc. ("Holly Products"). To control this sock, Klotsman and Satter put shares in the brokerage accounts of foreign corporations ████████████████████ Satter then used White Rock to underwrite initial public offerings for Holly Products and enlisted brokers at White Rock and other firms to hype the stock to retail customers. To inflate the demand, ████████ n ██ Satter made secret payoffs (in cash or securities) to brokers at White Rock and other firms based on the sales they generated. As brokers generated demand for the stock, ███████████ Satter sold the shares ███ secretly controlled, generating more than $10 million in profits which were then laundered through various offshore and domestic accounts.

208.   The ████████ describes frauds besides Holly Products, and the money laundering Satter used, ██████████████████████████████████████████

██████████████████████████████████████████████████ ████

---

[8] There is remarkable similarity between method of operation of State Street and the methods of operation of Bayrock, including████████████████, the frauds on partners and on the public, Satter's use or planned use of shell companies ██████████████ e.g. ¶138, and the use of dummy companies like Bayrock Group Inc. through which Bayrock funneled at least $1,5000,000 of unreported, untaxed income to Satter so he and Bayrock could pretend he had separated from Bayrock, his membership interests transferred into a "trust" for his wife for additional plausible deniability of his Bayrock ownership.

209.    Twenty of Satter's White Rock confederates, including members of the Bonanno, Gambino, and Colombo Mafia organized crime families, were also convicted, many on racketeering charges. Most were sentenced to prison terms and multimillion dollar restitution.

210.    This was Satter's second felony conviction; he was convicted in 1993 of first-degree assault with intent to cause serious injury with a weapon and imprisoned for 1-1/2 to 4-1/2 years.

211.    On his release from prison, Satter was perpetrating his crimes at White Rock even while still on parole for that assault conviction.

212.    And ███████████████████████████████, he ran White Rock even though he had been barred by the NASD from working in a significant capacity in the securities industry[9]:

213.    In short, while still on parole from his previous felony conviction for assault with a deadly weapon, Satter defrauded the NASD; hid his active role in the operation of a Mafia and Russian mob securities broker/dealer racketeering enterprise through a pattern of predicate crimes ███████████████████; hid his partnership in the firm; ███████████████ ██████████; defrauded investors; and laundered the proceeds of its illegal activities.

214.    So it is no surprise that in late 2002, while not even sentenced yet for these racketeering crimes and still cooperating with the US Attorney's Office, Satter proceeded to do the same thing right under the nose of the U.S. Probation office, commencing his next racketeering crimes while still involved with, in fact while not even yet sentenced for, his last.



SATTER INFILTRATES BAYROCK AND THE RACKETEERING STARTS

215.    Satter infiltrated Bayrock in 2002, soon becoming Arif's covert majority partner, hiding his partnership in Bayrock[19], then proceeded to skim off and fail to report millions of dollars of taxable cash income; hide his participation in the operation and management of all aspects of Bayrock Group LLC, including through a pattern of predicate crimes including threats of violence; defrauding investors, lenders, and partners; laundering the proceeds of Bayrock's illegal activities; and defrauding and deceiving the U.S. Judiciary, obstructing justice by giving false, misleading, and incomplete information to a U.S. Probation Officer.

216.    At this time, late 2002 to early 2003, Satter still had not yet been sentenced for his State Street racketeering, and he knew in the presentence investigation he would be required to disclose complete, accurate information about his income, assets, and ability to pay restitution, and he knew that his near million dollar a year income and ownership of more than half the company would subject him to significant restitution order, like his Mafia and Russian mob co-defendants.

217.    So in February 2003 Arif conspired with Satter to, and did, hide his ownership of, and income from, Bayrock, allowing Satter to skim the better part of a million dollars a year in cash, unreported and untaxed, the money sometimes wired to Satter's wife or third parties. The pretext was that these were "loans", but Arif and Satter never took that seriously, as shown *infra*.

218.    Satter obstructed justice by giving false or misleading information to a U.S. Probation Officer, in violation of 18 USC §1503. ███████████████████████

████████████████████████████

---

[19] Details and documentation, including a signed, witnessed, and notarized Bayrock document explicitly confirming that since no later than January 1, 2003, Satter owned very substantial, approximately 50%, membership interests in each and every one of Bayrock Group LLC and related companies, Exh. D., are alleged in the OWNERSHIP FRAUDS section. Satter owned about 50% of the equity in each and every Bayrock company, not just Bayrock Group LLC but also all the subsidiaries and lower-tier companies and so mathematically owned about 62% of Bayrock overall, having a 50% of all the distributions at each and every level of the hierarchy as they "bubbled up" from the lower tiers, are in the COMPENSATION FRAUDS allegations *infra*)

42



219.   This was also mail or wire fraud, 18 USC §1341 or 1343: He defrauded the Probation Office in order to deprive his racketeering victims of restitution by understating his ability to pay.

220.

A.

B.   Satter's "advances" ██████████████ by the scheduled time of his sentencing, ██
██████████████ July 2004, ██████ were $822,000:

| | |
|---|---|
| 02.14.2003: | $250,000 |
| 12.22.2003 | $103,000 (Bayrock paid this to Satter's wife Viktoria) |
| 03.09.2004 | $  75,000 (Bayrock paid this to his landlord for 7 months rent) |
| 03.17.2004 | $100,000 |
| 05.13.2004 | $173,000 (Bayrock paid this to attorney escrow for his house) |
| 07.02.2004 | $  14,000 (Bayrock paid this to Satter's mortgage company) |
| 12.03.2004 | $106,000 |

C.   These "advances" were sham "loans" never intended to be repaid, a pretext to let
him skim what would total $3,750,000 cash by 2007, almost $1,000,000 per year, without
paying tax. This scheme is detailed *infra*. Of course he gave no documentation of the
advances, there wasn't any to give, and wouldn't be for years until a sham "note" in 2006.

D.   ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

E.   Satter didn't have a monthly income of $0, he had the equivalent of an over
$1,000,000 salary because he skimmed $50,000 to $100,000 month after month, tax-free.

F.   ████████████████████████████████████████████████ he was in
contract on a $1,750,000 Sands Point mansion, but he delayed the close until the report
was done. When he closed in July 2004, Bayrock paid his $175,000 down payment and
he took mortgages of $1,600,000. Disclosure should reveal his mortgage applications told
the lenders a story quite different from the ████████████████████████████
████████████████████████ story he gave the Probation Officer.

221.   At the time of his sentencing ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ he

44

owned most of Bayrock, his membership interests were worth millions of dollars, he had the equivalent of a million dollar a year salary, was committing millions of dollars of tax fraud by hiding income skimmed from Bayrock, and had just purchased a $1,750,000 mansion.

SKIMMING ALMOST $1,000,000 A YEAR

222.     From 2003 Arif and Satter, then from 2005 with Schwarz, arranged for and participated in Satter's skimming almost $1,000,000 per year of unreported and untaxed cash from Bayrock Group LLC. By 2007 Satter had skimmed off the following amounts, counting amounts Bayrock paid for his personal American Express bills:

| Year | Amount Skimmed | Cumulative Amount Skimmed | With Interest (Approx.) |
|------|----------------|---------------------------|-------------------------|
| 2003 | $ 355,000.00 | $ 355,000.00 | $ 372,750 |
| 2004 | $ 578,201.29 | $ 933,201.29 | $ 1,017,136 |
| 2005 | $ 673,160.25 | $ 1,606,361.54 | $ 1,825,668 |
| 2006 | $ 654,965.20 | $ 2,261,326.74 | $ 2,695,948 |
| 2007 | $ 1,475,085.05 | $ 8,736,411.79 | $ 4,514,382 |

223.     That's almost $5,000,000 Satter "owed" by the end of 2007, or $1,000,000 a year.

224.     Bayrock Group LLC's monthly dashboard books, kept by Bayrock bookkeepers Maria Simonchy and Sofia Kontorovich, showed these skims as "loans" to Satter; there's a whole cash sub-account dedicated just to these recurring "loans", showing Arif, Satter, and Schwarz's intent to keep them going month after month, year after year, but there is never a dime of principal repayment recorded, and the dashboard spreadsheets don't include provision for interest accrual.

225.     And, while they were on the cash ledgers as "loans", not one penny of these "loans" were properly reported on the Bayrock Group LLC partnership tax returns[11].

---

[11] True "loans" from Bayrock Group LLC, would be balance sheet assets, but the balance sheets on the 2004, 2005, and 2006 partnership returns as prepared by Alex Salomon and physically delivered by common carrier to Bayrock for subscription and filing show no corresponding entries. Except, These "loans" continued to foul the Bayrock Group LLC returns until they are audited for 2004 by the IRS in 2007 and, with the complicity of Nixon Peabody, decided the best way to handle these "loans" was to commit tax fraud, perjury, and obstruction and pretend they were "employee loans" and subscribe and file fraudulent returns and schedules to cover this up; this is alleged in detail *infra*.

45